UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| MELINDA EBAUGH, | ) | CIV. 10-4153-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER DENYING THIRD-PARTY |
| PETSMART, INC., | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMBASSADOR FLOOR CARE | ) | |
| SERVICE, LLC, and | ) | |
| KEITH NETTEN, d/b/a Detailing | ) | |
| Unlimited, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

Plaintiff, Melinda Ebaugh, brought this negligence claim against defendant and third-party plaintiff, PetSmart, Inc., for damages that arose when she slipped, fell, and was injured at the PetSmart store. Docket 1. PetSmart filed a third-party complaint and requested contribution and indemnification from third-party defendants, Ambassador Floor Care Service, LLC, and Keith Netten, doing business as Detailing Unlimited. Docket 12.

Netten moves for summary judgment and claims that he was not negligent, he owed Ebaugh no duty of care, and he was not an independent contractor such that liability would attach to him personally. Docket 43. PetSmart resists that motion and claims that there are material facts in dispute

and Netten owes Ebaugh a duty of care separate from PetSmart and Ambassador. Docket 55. Ambassador also resists summary judgment and claims that Netten was not an employee of Ambassador. Docket 51. Ebaugh takes no position on Netten's motion for summary judgment. Docket 47. For the following reasons, Netten's motion is denied.

## BACKGROUND

PetSmart is a pet store that also offers veterinarian and grooming services in Sioux Falls, South Dakota. PetSmart used a company called USM Horizons (USM) to find and contract with a cleaning service to clean PetSmart's Sioux Falls store. Netten is a solo practitioner who does business under the name Detailing Unlimited.[1] USM hired Netten in May of 2009 to clean the PetSmart store five days a week. Each day, Netten cleaned the store before it opened at 9 a.m. Netten swept the floors, wiped windows, and cleaned the bathrooms. All cleaning equipment was provided by USM for Netten's use, and PetSmart supplied all the cleaning materials. Each day, a PetSmart manager would sign off on the cleaning list to ensure that Netten accomplished all his cleaning. The manager would tell Netten what to clean and what amounted to an acceptable level of cleanliness, or he would ask that the cleaning be done again if needed.

---

[1] Netten stated that he started the business Detailing Unlimited because USM needed him to have an entity name. Docket 46-6 at 2.

PetSmart stripped and rewaxed its floors approximately every other year. Prior to July of 2009, PetSmart decided that its floors needed to be stripped and rewaxed. An employee of USM asked Netten if he knew how to strip and rewax floors, but Netten did not know how, did not have the manpower, and did not have the equipment to complete the job. USM then contacted Scott Schmideskamp, Director of Operations for Ambassador, to ask if Ambassador could complete the job. Schmideskamp agreed to strip and rewax the PetSmart floors while also training Netten so he could perform the job on his own in the future.

Ambassador provided all the equipment necessary to complete the PetSmart job, including the stripping machine, an auto scrubber, and mops and buckets. PetSmart supplied the chemical stripper and wax. Ambassador paid Netten for his work on the PetSmart project. Each evening Mark Gunderson, PetSmart's operations manager, would ask the Ambassador employees when the store could open and would specify the time that the work had to be completed each morning. Docket 44 ¶ 32. He remained on the premises while Ambassador and Netten stripped and waxed each night.

During the first night of the PetSmart job, Netten worked with two Ambassador employees, Schmideskamp and Eric Landis. They showed Netten how to mix and apply the stripping solution. Netten then applied the stripping solution to the floor with a mop, and the two Ambassador employees followed with the propane stripper and auto scrubber and applied the wax. On that first

evening, the Ambassador crew stripped the main or center aisle in PetSmart and the small aisles to the south, but only the smaller aisles were waxed. This resulted in a stripped but bare center aisle. During the second evening, Netten worked with Landis while Schmideskamp worked at a nearby store. That night, Netten and Landis stripped and waxed the aisles to the north of the center aisle. The center aisle was still stripped and bare.

On the morning of Ebaugh's accident on July 11, 2009, one of PetSmart's managers, Jodi Hoyt, arrived at PetSmart at 6 a.m., and noted that the Ambassador men were still working.[2] Schmideskamp arrived at PetSmart around 7 a.m. and stated that the work was completed for the day. When Netten had finished with the floor project for the day, he went about completing his normal cleaning routine. Netten then left PetSmart before 8 a.m. Before leaving, Netten taped off the drying aisle to the north of the store in an area known as "cat can alley" and put up a "do not enter" sign because the aisle was still wet. Netten also put a caution sign by the front door to warn customers about the condition of the floor. The Ambassador employees also used a

---

[2] There is a dispute as to when the Ambassador team was supposed to stop working each morning. Operations Manager Gunderson claimed that the Ambassador crew had to be done each morning at 7 a.m. when the customers began arriving. Docket 46-5 at 6. Netten stated that he was never specifically told when they had to be done each morning, but that they "all knew that, you know, be done by 8:00 at the latest, cleaned up and off the store floor so that the employees could get their stuff done, too." Docket 46-6 at 7. Schmideskamp says he does not remember being told when they had to complete their work each morning, but he assumed they had to be done and ready for people to show up around 9 a.m. Docket 46-8 at 9.

number of caution signs as they worked and moved them around as needed. The warning signs were placed throughout the store, and there were three or four signs down the center aisle and one by the front door.

The morning of the accident, the center aisle remained stripped but not waxed, and the aisles to the north were still drying. Once the store was open for business, a PetSmart employee greeted employees and customers upon entrance into the store. The PetSmart employees told customers that the floors had been waxed, that people should use caution, and they should only use the center aisle. Docket 44 ¶ 64. PetSmart employees also attempted to create a wall that funneled people down the main aisle and was meant to prevent customers and employees from straying off of the center aisle to the freshly-waxed aisles on the north side of the store. Docket 44 ¶ 65.

Around 7:45 a.m. on July 14, 2009, Ebaugh entered PetSmart to drop off her two dogs for grooming. Ebaugh saw a cone near the front door and hesitated at the entrance. At least two PetSmart employees spoke with Ebaugh when she entered the store. They told her that the floors had been waxed and may still be wet, they instructed her to use caution, and they told her that the center aisle was safe to walk to the grooming salon and back. Docket 44 ¶ 68. Ebaugh acknowledges that she heard the PetSmart employees' instructions. Ebaugh went down the center aisle to the grooming salon at the back of the store. She claims she fell twice on that trip and that the center aisle was wet. After dropping her dogs off at the groomer, Ebaugh tried to exit the store

through the aisles on the north side of the store. When Ebaugh was halfway down the north aisle, she slipped and fell and was injured.

Ebaugh filed her negligence claim against PetSmart. Docket 1-2 at 2. PetSmart filed a third-party complaint seeking contribution and indemnification from third-party defendants, Ambassador and Netten. Docket 12. Netten filed an amended answer with a cross-claim against Ambassador and a counterclaim against PetSmart. Docket 21. Netten now moves for summary judgment. Docket 43.

## STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." (internal quotations omitted)). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows that there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

Once the moving party has met its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either "by citing to

particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

Netten argues that he was not negligent when he participated in the strip and rewax of the PetSmart store, and that there is no evidence that his actions were the breach of a duty or the proximate cause of Ebaugh's injuries. Additionally, Netten claims that he does not owe a duty of care to Ebaugh because he was working as an employee of Ambassador at the time of the accident, so even if he were negligent he is entitled to indemnification from Ambassador. Both PetSmart and Ambassador assert that Netten was acting as an independent contractor and that he steps into the shoes of the premises owner to owe a distinct duty of care to PetSmart invitees like Ebaugh. PetSmart and Ambassador also allege that there are genuine disputes of material fact

that survive summary judgment as to whether Netten breached his duty of care or proximately caused Ebaugh's injuries.

## I. Duty of Care

"Summary judgment is generally not feasible in negligence cases." *Andrushchenko v. Silchuk*, 744 N.W.2d 850, 854 (S.D. 2008) (citing *Satterlee v. Johnson*, 526 N.W.2d 256, 258 (S.D. 1995)). "It is only when the evidence is such that reasonable [persons] can draw but one conclusion from facts and inferences that they become a matter of law and this occurs rarely." *Satterlee*, 526 N.W.2d at 258 (citations omitted). *See also Wildeboer v. S.D. Junior Chamber of Commerce, Inc.*, 561 N.W.2d 666, 669 (S.D. 1997) ("Summary judgment is generally not feasible in negligence cases because the standard of the reasonable man must be applied to conflicting testimony[.]") (citations omitted). "In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Fisher Sand & Gravel Co. v. S.D. Dep't of Trans.*, 558 N.W.2d 864, 867 (S.D. 1997) (citation omitted).

A duty is usually created through common law or by statute and is a question of law typically resolved by the court. *Andrushchenko*, 744 N.W.2d at 857 (citations omitted). The duty inquiry asks whether " 'a relationship exists between the parties such that the law will impose upon the defendant a legal obligation of reasonable conduct for the benefit of the plaintiff.' " *Casillas v.*

*Schubauer*, 714 N.W.2d 84, 88 (S.D. 2006) (quoting *In re Estate of Shuck v. Perkins Cnty.*, 577 N.W.2d 584, 586 (S.D. 1998)).

### A.    Premises Liability

South Dakota generally follows the traditional premises liability common law to vary the landowner's duty of care depending on the status of the plaintiff as an invitee, licensee, or trespasser. *Musch v. H-D Elec. Coop.*, 460 N.W.2d 149, 151 (S.D. 1990) (citation omitted). "These categories make out a sliding standard, where, as the legal status of the visitors improves, the landowner owes him or her a higher standard of care." *Id.* Landowners must provide the highest form of care when a plaintiff is an invitee or a business visitor in that " 'the possessor of land owes an invitee or business visitor the duty of exercising reasonable or ordinary care for his safety and is liable for the breach of such duty.' " *Rowland v. Log Cabin, Inc.*, 658 N.W.2d 76, 79 (S.D. 2003) (quoting *Norris v. Chicago, M. St. P. & P.R. Co.*, 51 N.W.2d 792, 793 (S.D. 1952); Restatement (Second) of Torts § 343 (1965)). A business invitee is "a business visitor who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land." *Rowland*, 658 N.W.2d at 80 (citations omitted).

"This duty requires the landowner to keep the property reasonably safe." *Luke v. Deal*, 692 N.W.2d 165, 169 (S.D. 2005) (citations omitted). The possessor of land must also "warn of concealed, dangerous conditions known to the landowner[.]" *Luther v. City of Winner*, 674 N.W.2d 339, 347 (S.D. 2004)

9

(citations omitted). The landowner has no duty to warn when a dangerous condition is obvious and the invitee should have reasonably known or been aware of it. *Id.* (internal quotations omitted). "The general duty of reasonable or ordinary care that a landowner owes invitees 'includes the duties owed to licensees to *warn* of concealed, dangerous conditions *known to the landowner* and to use ordinary care in active operations on the property.' " *Janis v. Nash Finch Co.*, 780 N.W.2d 497, 501 (S.D. 2010) (quoting *Mitchell v. Ankney*, 396 N.W.2d 312, 313-14 (S.D. 1986)).

When Ebaugh was bringing her pets to be groomed she was entering the premises as an invitee or business visitor of PetSmart. Thus, the inquiry is whether Netten stepped in the shoes of PetSmart as a land or premises owner to owe a duty of care to Ebaugh as an invitee. PetSmart argues that because Netten was performing work on the premises on behalf of the owner that he owed the same duty of care to PetSmart's invitees as did PetSmart itself.

The Restatement[3] (Second) of Torts provides that:

---

[3] The South Dakota Supreme Court "frequently consults and employs the Restatements." *Wildeboer,* 561 N.W.2d at 673 n.10 (Sabers, J., dissenting). *See also Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 770 (S.D. 2002) ("Of course, the Restatement's pronouncements are not binding on this Court; nevertheless, we have found its reasoning persuasive in many instances."). The South Dakota Supreme Court has repeatedly applied the Restatement in the area of premises liability. *See e.g., Luther*, 674 N.W.2d at 347 (applying the Restatement for the standard that applies to invitees); *Small v. McKennan Hosp.*, 437 N.W.2d 194, 199 (S.D. 1989) (discussing the Restatement's section on the possessor's duty to protect an invitee from third parties' unlawful acts); *Hofer v. Meyer*, 295 N.W.2d 333, 335-37 (S.D. 1980) (adopting Restatement (Second) of Torts § 339, which discusses the attractive nuisance doctrine).

> One who on behalf of the possessor of land erects a structure or *creates any other condition on the land* is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside the land by the dangerous character of the structure of other condition while the work is in his charge.

Restatement (Second) of Torts § 384 (emphasis added). This section of the Restatement applies when the owner of a building hires a general contractor to build a building and such liability applies to both the general contractor and any subcontractors retained by the general contractor. Restatement (Second) of Torts § 384 cmt. b. Section 384 also applies to those working on property for the possessor "irrespective of whether he does so as a servant of the possessor or as a[n] . . . independent contractor." Restatement (Second) of Torts § 384 cmt. c.

Although the South Dakota Supreme Court has not considered whether it will adopt § 384, this court has previously predicted that the South Dakota Supreme Court would adopt § 384. *See Smithey v. Stueve Constr. Co.*, Civ. No. 04-4067, 2007 WL 172511 (D.S.D. Jan. 18, 2007) (concluding that the South Dakota Supreme Court would apply § 384 and follow the majority of other jurisdictions). The court will also assume here that the South Dakota Supreme Court would adopt § 384. Because Netten was working to improve the floors within the store he was "creat[ing] any condition on the land" on behalf of the landowner with a full possessory interest in the land; therefore, Netten steps into the shoes of PetSmart and is entitled to PetSmart's liabilities and immunities. *See Smithey*, 2007 WL 172511, at *5 ("In this case, defendants

were working on behalf of CHS, who is the landowner and who has a full possessory interest in the property . . . thus [defendants] step in the shoes of CHS and are entitled to its liabilities and immunities.").

### B.     Employee or Independent Contractor

Netten argues that he was an employee under the direction and supervision of Ambassador at the time of the accident; therefore, he is entitled to indemnification from Ambassador and has no personal liability to Ebaugh as an independent contractor. The court must determine if Netten was an employee or independent contractor at the time of the accident to reach Netten's summary judgment claim.

Under South Dakota law, "[a]n employee is a person who is employed to render personal service to an employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer." SDCL 60-1-1. An independent contractor is "one who carries on an independent business and contracts to do a piece of work according to his own methods, without being subject to the control of the employer, except as to the product or the result of the work." *Moritz v. C & R Transfer Co.*, 266 N.W.2d 568, 571 (S.D. 1978) (citations omitted). Typically, the person who employs an independent contractor is not liable for the injury sustained through the performance of the contract by the contractor. *Clausen v. Aberdeen Grain Inspection, Inc.*, 594 N.W.2d 718, 721 (S.D. 1999) (citing 41 Am. Jur. 2d *Independent Contractors* § 29 (1995)).

12

When "the employer has no power of control over the manner in which the work is to be done by the contractor, it is . . . regarded as the contractor's own enterprise and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risks, and bearing them[.]" *Id.* at 722 (quoting Restatement (Second) of Torts § 409 cmt. b (1965)). Although one who hires an independent contractor does not have to insure the safety of the contractor's work, "if the hiring party retains control over the contractor's work and fails to exercise control in a reasonable fashion, it may be liable for damages that result." *Clausen*, 594 N.W.2d at 721 (citation omitted).

To determine whether a person is an employee or an independent contractor, the court considers each case based on its own unique facts and considers all features of the employment relationship. *Egemo v. Flores*, 470 N.W.2d 817, 820 (S.D. 1991) (citations omitted). Under South Dakota law, the court considers a two-part[4] test. *Id.* at 821. First, whether the worker was "free from control or direction over the performance of the services, both under contract of service and in fact[.]" *Id.* (quoting *Appeal of Hendrickson's Health Care Serv.*, 462 N.W.2d 655, 658 (S.D. 1990) (internal quotations omitted)). The

---

[4] The South Dakota Legislature has distinguished between an employee and an independent contractor in that employment is presumed unless it is shown that: "(1) The individual has been and will continue to be free from control or direction over the performance of the service, both under his contract of service and in fact; and (2) The individual is customarily engaged in an independently established trade, occupation, profession, or business." SDCL 61-1-11.

second factor is whether the worker was " 'customarily engaged in an independently established trade, occupation, profession, or business.' " *Id.*

When analyzing the first factor or the "right of control test," it is important to consider the method of payment, who furnished the equipment, the terminability of the employment, and other direct evidence of the right of control. *Egemo*, 470 N.W.2d at 821. Under the first factor of the test, most pertinent is the court's consideration of whether Netten was free from control or direction for the services at issue.

In this case, Netten was mainly under the direction and control of Ambassador. It is undisputed that the Ambassador employees had to show the strip and wax process to Netten. Netten stated, however, that he and the Ambassador employees all planned how to execute the job and "all kind of made a decision we're just going to divide the store up in three sections and do it that way." Docket 46-6 at 5. Netten also said that he had independent input in the way to accomplish the strip and wax because of his familiarity with the store.[5] Netten also claims that it was his idea to leave the center aisle bare and finish it last so customers had a place to walk due to the high foot traffic. There is no evidence that anyone from PetSmart mandated how the job be done or that Ambassador had requirements on how to accomplish the task. Netten also

---

[5] Netten stated that, "We all decided [how to plan the job] kind of together. You know, I looked at the store and I said, 'This is where your watering system is at, over here in this corner. If we start here we can work our way that way. We can do this side and we can leave this open.' " Docket 46-6 at 5.

noted that he made the independent decision to put up the "do not enter" sign near "cat can alley" and also independently decided to put warning pylons by the front door and in different places throughout the store. Docket 46-6 at 11-12.

Ambassador paid Netten for his services. Ambassador provided the machines necessary to effectuate the strip and wax, and PetSmart provided the materials like the wax, stripping solution, and smaller tools. There is no evidence of the terminability of the contract, but it appears that either party could sever the relationship at will. While these factors suggest that Netten was under the direction and control of Ambassador, there is also factual support that he was not the typical employee. *See Egemo*, 470 N.W.2d at 821 ("[A] mere general finding that the employer exercise control over the project by coordinating the duties necessary for its completion does not establish control dispositive of an employer/employee relationship.").

The first is that Netten was being trained so he could continue to apply these new skills at PetSmart in the future to accomplish the task on behalf of himself and his business. It is undisputed that this job was going to be a one-time only occurrence where Ambassador trained Netten. Ambassador was not training Netten for its benefit.[6] This was the equivalent of one contractor

---

[6] Scott Schmideskamp admitted that a representative of USM contacted him and said something like, "Hey, would you do me a favor and go up [to Sioux Falls] and teach [Netten] how to do this?" Docket 46-8 at 4. Schmideskamp admits that he trained Netten as a favor to the USM representative so that Netten could learn the skill and execute the job on his own in the future.

working with another to gain a new skill to use for his own benefit in future jobs with other employers.

Additionally, there is evidence in addition to planning the execution and placement of warning and caution signs that suggest that Netten did maintain some freedom on how to accomplish the job. Most notably, Netten completed the waxing portion of the project on his own after the accident occurred. By the third evening he was sufficiently trained to complete the task without the direction or control of any of Ambassador's employees. Training for the purpose of furthering one's own skillset or future business is the action of an independent contractor instead of an employee.

Under the second factor, the employee's occupation must be established, such that the enterprise was one "created and existing separate and apart from the relationship with the particular employer[.]" *Egemo*, 470 N.W.2d at 822. This separate enterprise or occupation must be able to survive termination of the relationship with the employer at issue. *Id.* "The individual must have a proprietary interest in the enterprise to the extent that [he] can operate it without hinderance [sic] from any other individual." *Id.*

When analyzing the second factor it is evident that Netten was engaged in an independently established trade, occupation, profession, or business prior to his training with Ambassador. The facts are undisputed that PetSmart hired Netten through a third-party business that acted as a headhunter or middleman through which PetSmart could find and obtain a local cleaning service. Although Netten was a solo practitioner and had not incorporated his

16

business, he did have a business name under which he accomplished his work: Detailing Unlimited.

The evidence in the record suggests that Netten was already doing independent contract work as the daily cleaner for PetSmart and that is how he was introduced to Ambassador and the opportunity to learn the skill of stripping and waxing. At the time, Netten had a proprietary interest in his enterprise because he operated his business without help from any other person. Additionally, it is undisputed that the PetSmart rewax was for training purposes, and Netten did not rely on Ambassador for regular work or pay. *See Hendricksons's Health Care Serv.*, 462 N.W.2d at 659 (stating that the inquiry is whether the individual engages himself in an economic enterprise so he bears the risk of his own unemployment, and if he is unemployed it is a function of the market rather than his master).

Although there is factual support that Netten was under the direction of Ambassador during his training because Ambassador knew the skill and Netten did not, the fact that Netten had an established business and was working with Ambassador to learn a new skillset for his own business endeavors tips the scale in favor of a determination that he was an independent contractor while working on this project. As such, any liability for his actions would not be attributable to Ambassador and is the personal obligation of Netten himself.

### B. Breach and Causation

Although the court need not go beyond the duty analysis, the court will analyze breach and proximate cause because summary judgment also is

inappropriate on the breach and proximate cause elements. "[G]enerally, once a duty is established, whether a breach of that duty occurred is for the finder of fact, not for the court." *Johnson v. Matthew J. Batchelder Co.*, 779 N.W.2d 690, 694 (S.D. 2010) (citing *Casillas*, 714 N.W.2d at 88). "Questions of proximate cause are for the jury in 'all but the rarest of cases.' " *Fritz v. Howard Twp.*, 570 N.W.2d 240, 244 (S.D. 1997) (quoting *Bauman v. Auch*, 539 N.W.2d 320, 325 (S.D. 1995)). Traditionally, the elements of breach and causation generally involve issues of material fact that must be resolved by the finder of fact.

There are numerous questions of fact in dispute as to whether Netten's actions caused Ebaugh's accident. For instance, Ebaugh claims that she fell twice on the walk to the groomer's area down the center aisle. There is evidence that she told the treating physician that she only fell once on her initial walk down the center aisle. Docket 44 ¶ 72. There is testimony from a PetSmart employee, Kaylee DeLeon, who stated that she watched Ebaugh walk down the center aisle the whole way and never saw her fall once. Docket 44 ¶ 71. There was no wax on that aisle at the time of the fall, so the only slippery substance would have been the stripping solution applied by Netten. This dispute in fact goes directly to the question of whether Netten breached his duty of care because he admitted that he was the party who applied the stripping solution to the center aisle. Moreover, Ebaugh claims that the center aisle was slippery and appeared wet when she walked down it. All other witnesses, plaintiff's husband included, testified that the aisle was dry. Docket 44 ¶ 70. Finally, all defendants disagree as to what time they were to complete the job each

morning, which is a genuine issue in dispute that is material to the resolution of the issues of breach and proximate cause.

Additionally, Netten has admitted that he placed a number of caution signs up around the store before he left for the day. The duty to warn is an issue that is pertinent to the summary judgment determination. Netten argues that it was PetSmart's employees who let customers into the store and PetSmart who had the duty to warn. Docket 45 at 12. This argument, however, goes to the apportionment of fault not whether Netten himself breached a duty or whether his actions proximately caused Ebaugh's injuries. Whether Netten appropriately warned Ebaugh of the condition of the floors within PetSmart is a determination for the factfinder as to whether any of Netten's actions proximately caused the injury and subsequent damages to Ebaugh. *See Janis*, 780 N.W.2d at 500 ("[Q]uestions of negligence . . . are for the jury in all but the rarest of cases so long as there is evidence to support the issues.").

Netten owed a duty of care to invitees of PetSmart as an independent contractor making improvements to the land. Questions of breach and proximate cause are questions of fact to be resolved by the factfinder. Finally, viewing the evidence in the light most favorable to the nonmoving parties, there are genuine issues of fact still in dispute that are material to the resolution of this claim and that preclude summary judgment.

## CONCLUSION

Because Netten is an independent contractor, he steps into the shoes of the premises owner and owes a duty to invitees or business guests of PetSmart.

He is required to keep the premises reasonably safe and has a duty to warn guests of known dangers. For that reason, Netten cannot show as a matter of law that he owes no duty of care to Ebaugh or that summary judgment is appropriate. Additionally, the elements of breach and proximate cause are traditionally questions of fact that must be resolved by the jury, and in this case, there are material issues of genuine fact still in dispute that preclude summary judgment. Whether Netten breached his duty of care, whether his actions were the proximate cause of Ebaugh's damages, and apportionment of fault are all issues that must be resolved by a jury. For these reasons, summary judgment is precluded. It is therefore

ORDERED that third-party defendant Netten's motion for summary judgment (Docket 43) is denied.

Dated July 2, 2012.

                                    BY THE COURT:

                                    /s/ *Karen E. Schreier*
                                    KAREN E. SCHREIER
                                    CHIEF JUDGE